Anthony M. Solis, SBN 198580
A Professional Law Corporation
23679 Calabasas Road, Suite 412
Calabasas, CA 91302-1502
213-489-5880
anthonysolislaw@gmail.com

Marilyn E. Bednarski, SBN 105322
McLane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, CA 91106
626-844-7660
mbednarski@mbllegal.com

Co-National Representatives of the Criminal Justice Act Panel
for the Central District of California

United States District Court

Central District of California

| United States of America, | ) | Case No: 2:25-mj-06126-DUTY |
|---|---|---|
| Plaintiff, | ) | |
| | ) | Memorandum in Response to |
| | ) | Docket #46 |
| v. | ) | |
| Ronald Alexis Correas, et al., | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW attorneys Anthony M. Solis and Marilyn Bednarski in their capacities as co-national representatives of the Criminal Justice Act Panel for the Central District of California and submit the attached Memorandum further to Chief Judge Dolly M. Gee's order in this matter (Dkt. #46) and in response to the government's Memorandum attached thereto.

Dated: November 14, 2025

*Anthony M. Solis /s/*
*Marilyn E. Bednarski /s/*

_____
By: Anthony M. Solis
Marilyn Bednarski

# MEMORANDUM

Federal Public Defender
Central District of California

**To:**   United States District Court                    Date: 11/11/2025
          Central District of California

**cc:**   Bilal A. Essayli, First Assistant United States Attorney
          Alexander B. Schwab, Acting Chief, Criminal Division
          Frances S. Lewis, Chief, General Crimes
          Alexander P. Robbins, Acting Chief, Criminal Appeals Section

**Fr:**   Cuauhtemoc Ortega, Federal Public Defender
          Amy Karlin, Chief Deputy Federal Public Defender
          Margaret Farrand, Chief of Writs & Appeals
          Alex Botoman, Appellate Deputy Federal Public Defender
          Anthony Solis, CJA Representative
          Marilyn Bednarski, CJA Representative

**Re:**   Appointment of Counsel for Indigent Defendants During Lapse of CJA Funding

---

On Wednesday, November 5, 2025, the Federal Public Defender's Office
learned that the United States Attorney's Office had provided this Court with a one-
sided memorandum setting forth the government's position on two legal issues at
the heart of criminal defendants' constitutional right to effective representation: (1)
whether the Court can conscript attorneys into representing indigent criminal
defendants without pay; and (2) the surprising suggestion that the Court could,
consistent with ethical rules, appoint a single defense attorney to represent multiple
co-defendants in the same criminal case for initial appearances and detention
hearings. Though the memo suggests it was requested by the Court, the government
provided this memo *ex parte*, without any notice to the FPDO or any representative
of the CJA panel.

Regardless of how the memo was requested, the FPD is profoundly troubled
that the government failed to disclose its substantive communications with the Court
on legal matters potentially pending before the Court—it knows this is inappropriate.
The representation of criminal defendants under the Constitution and Criminal
Justice Act is not a matter in which the government properly has *any* say—much

1

less the only say. The government's memorandum should be disregarded for that reason alone.

But the government's position is also wrong on the merits. The government's memorandum makes two incorrect, and deeply problematic, claims. First, it asserts that courts can compel attorneys to represent indigent criminal defendants in criminal proceedings without compensating them—even, apparently, for several months during a time when many criminal practitioners in this district already face financial ruin from the existing prolonged nonpayment. Second, it claims that ethical rules permit courts to appoint a single defense attorney to represent multiple co-defendants simultaneously, even though those defendants commonly have conflicting interests, goals, access to sureties, and accounts of the facts that may be difficult to recognize at the outset of a case.

Contrary to the government's claims, this Court may not simply force unwilling attorneys to represent criminal defendants without pay. The months-long cessation of payments to CJA attorneys (since July 2025) has already taken a devastating toll on these attorneys' ability to survive financially, attend to their families' basic needs, and effectively represent their clients against the extraordinary weight of the United States government. And courts have recognized that prolonged, burdensome, unpaid court appointments can rise to the level of an unconstitutional taking when they threaten attorneys' livelihoods and ability to provide competent representation—precisely what is now occurring.

The government's suggestion that CJA panel attorneys should now be compelled—on pain of imprisonment—to accept *even more* unpaid appointments is deeply insulting to the extraordinary sacrifices they have already made. And to the extent the government is suggesting that the Court require representation by attorneys who are not already members of the CJA panel, it provides no support for its dubious claim that there are "(at least) hundreds" of attorneys in the District with the necessary competence and experience to take on the complex and specialized assignment of defending a federal criminal case. Conscripting attorneys should be a non-starter.

The government is equally wrong that a single attorney can be appointed to simultaneously represent co-defendants in the same case, even "just" for initial appearances and detention hearings. Ethics rules forbid this practice, which would go well beyond creating "a significant risk the lawyer's representation of the client w[ould] be materially limited by the lawyer's responsibilities to . . . another client." Cal. R. Prof. Conduct 1.7(b). Indeed, simultaneous representation would create a minefield of conflicts. One attorney cannot meaningfully interview multiple clients

without risking exposure to confidential information that a co-defendant should not have. And more fundamentally, each defendant has a right to expect unconflicted counsel from whom he can seek advice, and with whom he can share confidences, without worrying that those discussions will be used against him. Clients could not meaningfully waive such conflicts without the opportunity to consult with unconflicted counsel, the unavailability of which prompted the government's memorandum in the first place.

In short, the Court should reject the government's extraordinary memorandum. Attorneys in this district have persevered through an unprecedented funding lapse to ensure that all those facing the power of the federal government get the representation that is constitutionally owed to them. They should not—and cannot—be required to do more.

## A.     The Court Should Strike the Government's Pleading, Which Improperly Opined on Matters Pertaining to the Appointment of Defense Counsel

The government grossly overstepped by submitting its views on how criminal defense counsel should be appointed and compensated, regardless of whether a judicial actor requested the memo or not. That this was done *ex parte*, and without notice to the FPD or CJA panel, renders the government's submission all the more inappropriate.

Under well-settled Ninth Circuit law, it is improper for the government to have *any* say in the appointment of defense counsel. *United States v. Wells*, 879 F.3d 900, 913 (9th Cir. 2018). That issue is "exclusively within the province of the judiciary." *Id.* The government's exclusion from issues pertaining to appointed counsel "is a significant contributing factor to the fairness of our system and the CJA's role in redressing the imbalance of power between an indigent defendant and the Government." *Id.*

It was particularly inappropriate, here, for the government to advocate for positions that would leave indigent defendants represented by counsel who are conflicted, working involuntarily and without pay, inexperienced in federal criminal defense, or a combination of these problems. *See id.* The government neither represents these individuals—who constitute some of the most vulnerable members of our society—nor has their interests in mind. To the contrary, its interests are directly opposed. It is unseemly that the government would insert itself into the Court's determination of what constitutes constitutionally effective representation. *See id.*

3

The government should have "tend[ed] to its own knitting." *Id.* at 914. By weighing in on how the Court should appoint defense counsel—and in particular, by advocating for a system of involuntary and/or conflicted appointments that would be obviously disadvantageous to criminal defendants—the government has "placed itself in an ethically compromised position" and created "a reproachable air of stacking the deck" that this Court must unequivocally reject. *Id.* The Court should strike the government's submission and decline to consider its proposals for that reason alone. *Id.* at 913-14; *United States v. Cordova*, No. SACR 22-0034-CJC, ECF 465 (C.D. Cal. Oct. 21, 2022) (citing *Wells* in striking the government's opposition to the defendant's motion to maintain appointment of counsel).

**B.    No Authority Permits this Court to Require Members of the Bar to Represent Clients Without Compensation, where that Lack of Compensation is Prolonged, Threatens Counsel with Financial Ruin, and Prevents Effective Representation.**

Many CJA attorneys depend for their livelihoods on payments for representing indigent criminal defendants in this Court under the CJA. According to the Administrative Office for the U.S. Courts, "[a]bout 85 percent of [CJA panel attorneys] work for small firms or are solo practitioners who can ill afford long delays in payments for their work."[1] And criminal defense work is almost entirely CJA-funded: more than 90 percent of criminal defendants cannot afford to hire an attorney.[2] Yet, for months now—since July 2025—CJA attorneys have gone unpaid. Their resources dwindling, some CJA attorneys now face the threat of eviction, an inability to pay for basic necessities or feed their families, and the inexorable need to prioritize paid cases over uncompensated appointments. Some are paying for case-related expenses out of pocket. Others have been forced to stop taking CJA panel cases altogether to ensure their economic survival. As one attorney recently explained to the Court:

> To have your own firm, you expect at times to have mean years or to make some problematic errors, but that didn't happen this time. The end result is because of a settlement I had this year, I was okay. But come December, I'm

---

[1] *Funding Crisis Leaves Defense Lawyers Working Without Pay* (July 15, 2025), https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay

[2] *Id.*

out of money, flat out of money. We're talking out of money to pay rent, to pay car payments, to pay health insurance, and to pay life insurance.

So I have gone back to CJA's counsel. They have provided me a letter from the court explaining the situation, the delayed payment. I took that to the management company where I live and was told that if I don't pay, I get a three-day notice.

*See* Ex. A at 4:19-5:5 (transcript of October 22, 2025 hearing in *United States v. Guajardo*, No. SACR 22-00034-FWS (C.D. Cal., Oct. 22, 2025).

Other CJA attorneys describe similar hardships:

I have two small children and my expenses have exceeded our income three months in a row because I dedicated time to my federal [CJA-appointed] case. I'm facing special needs and possible private school [for the children] with no ability to pay.

(Ex. B at 1 [redacted].)

I am the sole (female) breadwinner for my family of four, including two school-aged children. While I do not take on a large number of CJA cases, I do count on the income from those cases to support my family. The lack of funding has created stress and frustration and is untenable long term.

(Ex. B at 2 [redacted].)[3]

These examples illustrate separate but related problems that the government's memorandum fails to contend with. First, CJA attorneys' professions and financial viability are gravely threatened; their very livelihoods are being taken without compensation. Second, they are increasingly unable to provide constitutionally effective representation to indigent clients because the profound financial burdens they are facing—not to mention overwhelming physical and mental stress—have forced them to focus instead on cases for which they are actually being compensated.

---

[3] That the government would approach these heartrending circumstances with case law suggesting attorneys should be held in contempt and imprisoned for not taking unpaid appointments (Gov. Memo at 2-3), is astonishing and deeply unsettling.

The government cites authority that, it claims, permits this state of affairs. (Gov. Memo at 2.) But the cases it cites address nothing close to the sustained, systemic, and devastating lack of compensation for appointed attorneys in nearly all criminal cases in a district. They certainly do not address situations where ongoing nonpayment threatens financial ruin to the attorneys involved and prevents them from providing the effective representation the Constitution requires. Even if this consequence would not befall every attorney conscripted into service, the likelihood that it will so impact at least some (likely most) counsel and cases should preclude this Court from adopting the government's proposed system of involuntary appointments.

**1.    Compensating defense attorneys is critical to ensuring effective representation.**

Criminal defendants have a constitutional right, guaranteed by the Sixth Amendment, to "the aid of counsel in a criminal prosecution," which implies a right to appointed counsel if they cannot afford to retain one. *Gideon v. Wainwright*, 372 U.S. 335, 343 (1963); *Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938). This entitlement to counsel "protect[s] the fundamental right to a fair trial" and "is critical to the ability of the adversarial system to produce just results." *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). More than 50 years ago, Congress recognized in the Criminal Justice Act that paying court-appointed lawyers is fundamental to ensuring that critical constitutional function.[4]

But "[l]awyers who have no income and no money for paying the expenses of managing a law practice are incapable of handling client affairs." Cal. State Bar Standing Committee on Prof. Resp. & Conduct, Formal Opn. No. 1981-64.[5] In such

---

[4] *Criminal Justice Act: At 50 Years, a Landmark in the Right to Counsel* (Aug. 20, 2014), https://www.uscourts.gov/data-news/judiciary-news/2014/08/20//criminal-justice-act-50-years-a-landmark-right-counsel. The Central District of California's CJA Plan, similarly, requires that the plan "be administered so that those accused of a crime, or otherwise eligible for services under the CJA, will not be deprived of the right to counsel, or any element of representation necessary to an effective defense, due to lack of financial resources." *In re Criminal Justice Act Plan*, C.D. Cal. Gen. Order No. 24-07, at 1 (Dec. 3, 2024).

[5] *Available at* https://www.calbar.ca.gov/Portals/0/documents/ethics/Opinions/1981-64.htm.

circumstances, ethical rules not only permit, but require, attorneys to decline continued court appointments: "withdrawal should be permitted or mandated pursuant to [the California] Rules of Professional Conduct], provided that reasonable steps are taken to avoid foreseeable prejudice to the clients." *Id.* (If acceptance of cases without "sufficient time, energy, or resources to handle new matters may result in delays or failures to prosecute client matters . . . new cases should not be accepted."); *see also United States v. 30.64 Acres of Land*, 795 F.2d 796, 800 n.7 (9th Cir. 1986) (attorneys "may" and "indeed, must" decline even mandatory appointments "if the attorney would be unable for some reason to adequately represent the client").

After four months of nonpayment, CJA attorneys in this district are reaching that breaking point. Forcing these attorneys to represent indigent clients against their will, and in the face of financial insolvency, is contrary to the Sixth Amendment and established ethical rules, and threatens widespread violations of clients' constitutional right to the effective assistance of counsel. For precisely this reason, courts around the country have stayed criminal proceedings due to lack of funding. *See, e.g.*, *United States v. Ahemeid*, No. 1:20-cr-502, ECF 145 at 2 (E.D.N.Y. Nov. 7, 2025) ("[T]he Sixth Amendment has never demanded that an attorney work without compensation and personally shoulder the costs associated with providing a defense."); *United States v. Tsethlikai*, No. 1:24-cr-539, ECF 108, at 7 (D.N.M. Oct. 18, 2025) ("[T]he shutdown has unquestionably impeded Defendant's right to counsel in this case.").

### 2. This Court should not require counsel to work without pay when such compulsion would risk an unconstitutional taking.

In addition to threatening constitutionally-effective representation under the Sixth Amendment, prolonged nonpayment of appointed attorneys also threatens to violate the Fifth Amendment's prohibition on takings without compensation.

The government utterly fails to acknowledge this risk, blithely contending that courts remain free to require lawyers to represent indigent clients without compensating them. (Gov. Memo at 2-4.) But none of the authorities it cites remotely supports a systemic, district-wide practice of requiring attorneys to represent indigent defendants without pay. Instead, it relies on cases that dealt with one-off or limited-time appointments that did not significantly burden an attorney's practice. *See Scheehle v. Justices of Supreme Court of Ariz.*, 508 F.3d 887, 889 (9th Cir. 2007) (upholding a system that required an attorney to serve as an arbitrator "for up to two days a year"); *United States v. Dillon*, 346 F.2d 633, 633-34 (9th Cir. 1965) (addressing the appointment of an attorney who performed 108 hours of work on a

single habeas case); *cf. 30.64 Acres of Land*, 795 F.2d at 801 (rejecting involuntary appointments in civil cases). Not only did these cases address nothing close to the situation in this district today, they have been widely criticized and should not be extended beyond their facts. *See, e.g.*, *Pruett v. State*, 574 So. 2d 1342, 1357 (Miss. 1990) ("[T]he historical argument advanced in *Dillon* was *decimated* in a law review article by Professor David Shapiro . . . ." (emphasis original)).[6]

Indeed, even the government's cases recognize that "an unreasonable amount of required uncompensated service" could constitute a taking. *Fam. Div. Trial Lawyers v. Moultrie*, 725 F.2d 695, 705 (D.C. Cir. 1984). The Ninth Circuit has reached the same conclusion. *Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1083 (9th Cir. 2015) ("[W]e agree that 'an unreasonable amount of required uncompensated service' might qualify as a taking." (quoting *Moultrie*)). As the D.C. Circuit explained in *Moultrie*, while uncompensated appointments are not necessarily unconstitutional "on [their] face," a system's "effect in practice" could be "so burdensome on a [particular] segment of the bar as to constitute a violation of those lawyers' fifth amendment rights." 725 F.2d at 697. "[A]t some point the burden on particular attorneys c[an] become so excessive"—from being required to engage without compensation in rigorous, resource-intensive, and often full-time litigation that leaves no time for paid work—"that it might rise to the level of a 'taking of property.'"[7] *Id.* at 706.

---

[6] *See State ex rel. Stephan v. Smith*, 747 P.2d 816, 841 (Kan. 1987) ("The later cases reflect a definite trend toward recognizing that the historical conditions from which the duty to provide free legal services evolved no longer exists in modern America"); *DeLisio v. Alaska Superior Court*, 740 P.2d 437, 441 (Alaska 1987) ([C]ompulsory representation of indigent defendants without full compensation . . . is neither as traditional nor venerable as had been previously supposed."); *see also Arnold v. Kemp*, 813 S.W.2d 770, 774-75 (Ark. 1991).

[7] Several other courts have also recognized that unreasonably burdensome pro bono requirements can rise to the level of a taking of property. *See, e.g., State v. Lynch*, 796 P.2d 1150, 1164 (Okla. 1990) (due process requires that attorneys be permitted a hearing where they can show a case appointment is unacceptable; uncompensated appointments could otherwise constitute unconstitutional takings); *People ex rel. Conn. v. Randolph*, 219 N.E.2d 337, 339-40 (Ill. 1966); *Bias v. State*, 568 P.2d 1269, 1271-72 (Okla.1977); *State ex rel. Partain v. Oakley*, 227 S.E.2d 314, 319 (W.Va. 1976); *cf. Menin v. Menin,* 79 Misc.2d 285, 293 (N.Y.

The government relies on cases holding that ***"occasional"*** compelled unpaid service by attorneys, "as a condition of bar membership," is not a violation of the takings clause. (Gov. Memo at 2.) **The operative word is "occasional."** In *Scheehle*, the Ninth Circuit held no taking occurred largely due to the de minimis, non-burdensome nature of the work the attorneys were required to perform: a maximum of just two days per year of service as an arbitrator, at $75 per day. 508 F.3d at 892-93 & n.5. The Court reasoned that "the economic impact" was "negligible," and that the two-day obligation did not "remotely outweigh[] the benefits conferred by admission to the practice of law." *Id.* at 892-93. Nothing in *Scheehle* lends any support to a system in which attorneys would be systemically and involuntarily forced to represent clients without compensation in complex and time-consuming federal criminal cases.

The government cites the traditions of the legal profession, claiming lawyers are aware that they will be expected to provide some amount of pro bono representation. (Gov. Memo at 4.) That is irrelevant to the situation at hand. Even accepting the dubious premise that attorneys practicing in the Central District of California in 2025 would think they could be required to perform a relatively small, discrete amount of unpaid work, "the right to conduct a business and enter a profession is considered a property right within the meaning of various constitutional provisions." *Moultrie*, 725 F.2d at 706. If court appointments "effectively den[y] [attorneys] the opportunity to maintain a remunerative practice" the result is a taking. *Id.* at 706.[8]

### 3. The Court cannot conscript attorneys without criminal law knowledge or experience into representing indigent defendants.

The government alternatively appears to suggest that instead of involuntarily appointing criminal law specialists like the CJA panel attorneys, the Court might begin conscripting attorneys who are *not* members of the panel. Its memo asserts

---

Sup. Ct. 1974) (appointment of counsel in civil case not mandated since such appointment would abridge appointed attorneys' property rights).

[8] Although the D.C. Circuit in *Moultrie* held the appointment system there was not per se unconstitutional under the takings clause, it did so for reasons not present here. The attorneys there were repeatedly warned that by joining the CJA panel, they were accepting the possibility of being appointed to some cases without pay. *Moultrie*, 725 F.2d at 705. They were not simply conscripted without warning or initially told they would receive compensation that was later withheld.

that "in addition to the CJA panel attorneys themselves, there are (at least) hundreds of qualified practicing members of the Central District of California bar, all of whom are duty-bound to accept a limited special appointment if ordered to do so by this Court." (Gov. Memo at 4.) It is unclear which "qualified practicing members" the government is referring to, what "quali[fications]" they have, or how the government believes it would be possible for the Court to efficiently and reliably vet any newly conscripted attorney before making an appointment.

It is also highly unlikely, as a factual matter, that there are "hundreds" of attorneys within the Central District of California who are qualified to serve as lead counsel on a federal criminal case but are not already members of the CJA panel. As even the government admits (Gov. Memo at 4), any lawyers appointed to criminal cases "must have sufficient experience and time to prepare," and the Court cannot "just grab somebody out of the hallway." (*Id.*) Providing constitutionally effective representation to defendants in federal criminal cases is a demanding, skill- and time-intensive endeavor that cannot be learned overnight.

This District's requirements for the CJA panel reflect this reality. To be accepted to the panel, an attorney must, *inter alia*:

- Possess sufficient knowledge and experience in federal court criminal matters, with hands-on experience in matters at the trial court level, including bail hearings, pre-trial motions, trial proceedings, and sentencing hearings;

- Demonstrate proficiency with the Bail Reform Act, Recommendations for Electronically Stored Information Discovery Production in Federal Criminal Cases ("ESI Protocol"), Federal Rules of Evidence, Federal Rules of Criminal Procedure, Federal Rules of Appellate Procedure, United States Sentencing Guidelines, federal sentencing procedures, and the Local Rules of the Court;

- Have the training and ability to manage and effectively utilize electronic case presentation equipment and software in the courtroom and manage electronic discovery;

- Have significant experience representing individuals charged with serious criminal offenses and demonstrate a commitment to the defense of individuals who lack the financial means to hire an attorney;

- Have experience or demonstrated ability to be able to communicate with and advocate for indigent individuals; and

- Have the ability to research, prepare, and present written and oral arguments on behalf of individuals beyond the filing of generic or canned briefs and the making of routine arguments.

*In re Criminal Justice Act Plan*, C.D. Cal. Gen. Order No. 24-07, at 10-11.

The Court also requires that panel applicants complete, at a minimum, 20 hours of MCLE or equivalent training on criminal law issues in the previous two-year period. And it further requires that they satisfy at least one of the following requirements:

- Practiced primarily criminal law in federal court for five years;

- Been employed for the last three years in the criminal division of the USAO or FPDO; or

- Had primary responsibility as counsel of record in at least 40 criminal cases (state or federal), including serving as second chair in at least two federal felony trials, and have chaired or second-chaired at least four sentencing hearings where the USSG applied.

*Id.* at 11-12.

The idea that there are at least "hundreds" of attorneys in the Central District that both possess these extensive qualifications, and are not already members of the CJA panel, defies credulity. *See Betschart v. Oregon*, 103 F.4th 607, 627 n.26 (9th Cir. 2024) (recounting a district court's comments that "it was insulting to the criminal defense bar to suggest that their essential work could be replicated by lawyers who lack criminal defense and/or trial experience").

**C.    The Court Cannot, Consistent With The Rules Of Ethics, Appoint A Single Attorney To Represent Co-Defendants For the Initial Appearance and Detention Hearing.**

The government takes the equally unfounded position that the Court can appoint a single lawyer to represent multiple co-defendants at the initial appearance and bail hearing stage. (Gov. Memo at 5-7.) It claims no concern arises unless "(1) counsel actively represented conflicting interests, and (2) an actual conflict of interest adversely affected his lawyer's performance." (Gov. Memo at 6.) And it

insists (with little elaboration) that "[a]ctual conflicts that adversely affect a lawyer's performance are unlikely to occur at the initial-appearance stage . . . because the factors to be considered by the Court in making that determination pertain to the defendant himself, *e.g.*, the history and characteristics of the defendant and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g)(3), (4)" (*Id.*)

These claims are both legally insupportable and profoundly factually wrong. As a legal matter, the government's authorities discussing "actual conflict" and "advers[e] effect" do not address whether counsel may *ethically* represent clients despite an obvious risk of conflict. They instead address the separate, backward-looking question of whether a conflict is severe enough to warrant habeas corpus relief after a conviction and sentence have already been imposed. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) (holding that "actual conflict" is necessary "to impugn a criminal conviction" after the fact); s*ee also United States v. Christakis*, 238 F.3d 1164, 1168-69 (9th Cir. 2001) (holding that actual conflict and adverse effect are needed for habeas relief under 28 U.S.C. § 2255); *United States v. Mett*, 65 F.3d 1531, 1534 (9th Cir. 1995) (same).

Those authorities have no application to the *ex ante* question of whether a court may appoint attorneys in ways that would thrust them into a crucible of potential conflicts. At that preliminary stage, the standard is not the habeas question of actual conflict and adverse effect, but whether there is a "***significant risk*** that the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client." Cal. R. Prof. Conduct 1.7(b) (emphasis added).

Significant risks of material limitation are inevitable if an attorney represents co-defendants at an initial appearance and detention hearing. *Cf. Cuyler*, 446 U.S. at 348 ("[A] possible conflict inheres in almost every instance of multiple representation . . . .")  Indeed, the risk is particularly serious at this stage because the array of potential conflicts may not be readily apparent to counsel who possess only limited information about their clients. "The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Wheat v. United States*, 486 U.S. 153, 162–63 (1988). Precisely for that reason, simultaneous representation of co-defendants is strongly disfavored. "The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an

informed consent to such multiple representation." *People v. Christian*, 41 Cal. App.
4th 986, 991 (1996).

From the very beginning, requiring a single attorney to represent multiple
clients at an initial appearance poses a panoply of problems. Attorneys cannot
control what clients tell them in the initial meeting. And they should not have to
tiptoe around potential conflicts issues when questioning their client and advancing
arguments on their behalf. In multi-defendant cases, questions about the "nature and
circumstances of the offense" and the "weight of the evidence"—factors that go
directly to whether a defendant should be released, 18 U.S.C. § 3142(g)(1)-(2)—
frequently implicate individual defendants' relative culpability, competing versions
of the facts, issues of cooperation, and situations where some defendants are
witnesses to others' conduct. The very act of talking with co-defendants whose
interests potentially conflict creates still further problems. Clients will likely distrust
an attorney who is also representing his or her co-defendants, and will be less likely
to share information freely or ask for candid advice. Attorneys' duty to maintain
client secrets (which attaches immediately upon appointment, L. Levinson & A.
Ricciardulli, *California Criminal Procedure* § 1.12 (Oct. 2025 update)) will also be
immediately compromised if the attorney is called upon to make bail arguments for
one client that might implicate information obtained from another. Calling sureties
to secure bail for multiple clients presents still further problems: if the co-defendants
are friends or relatives they may share the same surety pool and be vying for limited
resources.[9]

Simultaneous representation of co-defendants also poses ethical minefields in
light of lawyers' continuing duty to investigate and report to the court potential
conflicts. Cal. State Bar Standing Committee on Prof. Resp. & Conduct, Formal
Opn. No. 2019-197.[10] Absent discovery—which is almost surely not feasible at the

---

[9] The procedure the government suggests would also put a burden on the
court to inquire into the propriety of the multiple representation. *See Garcia v.
Bunnell*, 33 F.3d 1193, 1199 (9th Cir. 1994) ("Trial courts have a duty of inquiry
whenever they know or reasonably should know that a particular conflict may
exist.").

[10] *Available at*
https://www.calbar.ca.gov/Portals/0/documents/ethics/Opinions/CAL-2019-197-
%5B12-0005%5D-Seeking-Advice-About-%20Current-Clients.pdf ("Lawyers
have a continuing obligation to monitor their client relationships for conflicts," and
"[i]f a lawyer becomes aware of facts that may give rise to a conflict, the lawyer

initial appearance stage—such investigation is nearly impossible. Even if such discovery could somehow be obtained, attorneys could not reasonably analyze it for conflicts in the compressed timeframe available.  Multiple defendant gang cases, common in this district, exemplify the very real potential for conflicts of interest at the first appearance. *See, e.g., United States v.  Cruz Hernandez et. al*, C.D. Cal. no. 19-cr-117-ODW (32-defendant prosecution involving charges of first degree murder, RICO, and VICAR).

The government claims to be "aware of other Districts, like the District of Alaska, that have done this for multi-defendant takedown cases where procuring a sufficient number of panel attorneys on the same day has been difficult." (Gov. Memo at 5 n.1.) But that claim is false. The CJA Panel Administrator for the District of Alaska has confirmed that nothing of the sort takes place. Ex. C (Decl. of Sonja Belau). No attorney in Alaska conducts detention hearings on behalf of co-defendants in a criminal case or otherwise engages in any substantive representation on their behalf. *Id.* ¶¶ 6-8. To the extent an attorney provides any assistance to multiple co-defendants, it is only in an extraordinarily limited capacity. *Id.* ¶¶ 4-8.

Because many members of the Alaska CJA Panel live out of state, multi-defendant cases sometimes make it difficult for a sufficient number of panel attorneys to arrive in time for the initial appearance. *Id.* ¶ 4. When that occurs, a member of the Alaska Federal Public Defender's Office will appear as a "friend of the court" for the limited purpose of assisting the defendant in entering a not guilty plea (if necessary) and requesting that all other matters be continued until conflict-free counsel is available. *Id.* ¶¶ 4-6. In most of these cases, the defendant has already been assigned a specific conflict-free CJA panel attorney—that attorney was simply unable to make it to court for the hearing. *Id.* ¶ 5. The assigned panel attorney sometimes participates in the hearing telephonically, with the "friend of the court" attorney available to provide needed in-person support. *Id.*

In all cases, the "friend of the court" attorney advises the defendant that the Federal Public Defender's Office has a conflict and that the defendant should not tell them *anything* about the case. *Id.* ¶ 6. The "friend of the court" attorney does not assist the defendant in filling out the required financial affidavit (and thus does not become privy to the personal information on that affidavit). *Id.* ¶ 7. And the "friend

---

must take action to investigate, analyze the situation and take any additional steps required by the rules.")

of the court" attorney likewise does not take possession of the bail report or make any bail-related arguments. *Id.* ¶ 8.

As should be apparent, the situation in Alaska bears no resemblance to what the government asks this Court to do here: appoint a single attorney to handle the full initial appearances and detention hearings for multiple co-defendants. To do so, that attorney would have to interview the defendant, assist with the financial affidavit, read the bail report, make bail arguments, and much more—precisely what the Alaska attorneys *avoid* doing for the specific purpose of avoiding a conflict. *See id.* ¶¶ 6-8.

And the government's memorandum is conspicuously silent on what happens next. Even if one attorney could somehow handle the initial appearance and detention hearing, who would represent the defendant for the rest of the case? All individuals charged with crimes are entitled to a speedy trial. And a speedy trial cannot occur without an attorney to provide "competent and zealous advocacy outside of the courtroom." *Betschart*, 103 F.4th at 620. From the very beginning of the case, a defendant is entitled to an attorney to investigate lines of defense, provide confidential advice, ensure the defendant is competent to stand trial, communicate formal plea offers and provide guidance during the plea bargaining process, advise of possible risks in sentencing, assist with attempts to cooperate, and much more. *Id.* at 620-21. These "bedrock" Sixth Amendment rights cannot be vindicated without conflict-free counsel. *Id.*

Unlike in Alaska, the problem is not that a conflict-free attorney cannot make it to court in time for the initial appearance; it is that there is no conflict-free attorney available *at all*. The implication of the government's position is that defendants would sit in limbo (and potentially in custody) in the hope that someday a conflict-free attorney might become available to represent them. The Ninth Circuit recently held that a nearly identical scheme violates the Sixth Amendment. *Id.* at 619-25. This Court should not start down that road.

Finally, the Court should reject the government's suggestion that "defendants may waive the conflict and still allow the Court to appoint the same attorney, including a member of the Public Defender's office, to specially represent the defendants at their initial appearances and detention hearing." (Gov. Memo at 7.) At a minimum, a defendant (particularly one likely to be unsophisticated) cannot knowingly and intelligently waive a conflict without the opportunity to consult with conflict-free counsel. *See People v. Bonin*, 47 Cal. 3d 808, 837 (1989) (Before accepting a conflict waiver, the trial court must ensure, *inter alia*, that the defendant "has discussed the potential drawbacks of [potentially conflicted] representation

with his attorney, or if he wishes, *outside counsel*." (emphasis added)); *United States v. Martinez*, 143 F.3d 1266, 1269 (9th Cir. 1998) (upholding a conflict waiver when the defendant was informed "that he could receive outside legal advice about waiving the conflict, and that he could ask questions"). But the very premise of the government's memorandum is that no conflict-free counsel is available to provide this consultation. To simultaneously tell a defendant that he has a right to consult with conflict-free counsel, but that no such counsel is actually available, is tantamount to having no right at all. And it presents an unacceptable risk of coercing defendants into waiving conflicts that might be detrimental to their long-term interests for the potential short-term benefit of seeking release on bond. No waiver could be knowing and voluntary under these circumstances.

*       *       *

It is regrettable that this response became necessary. The government has no proper role in opining on the methods for appointing defense counsel. That it would advocate for positions obviously disadvantageous to indigent defendants should be especially condemned. The Court should reject the extraordinary call to conscript attorneys into involuntary unpaid service, and it should not put lawyers in the ethically perilous position of representing multiple parties to the same case. The answer is instead for the government to adequately fund the conflict-free defense to which all persons in our nation are constitutionally entitled.

# EXHIBIT A

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE FRED W. SLAUGHTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,      ) CERTIFIED TRANSCRIPT
                               )
                  Plaintiff,   )
       vs.                     )
                               )  SACR-22-00034-FWS
ABRAHAM GUAJARDO,              )
                               )
                  Defendant.   )
---------------------------)

(Excerpt of Proceedings)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

October 22, 2025

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

Case 2:25-mj-06126-DUTY    Document 107    Filed 11/14/25    Page 20 of 29    Page ID
#:356

2

```
1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3    GREGORY W. STAPLES
     Assistant United States Attorney
4    OFFICE OF THE U.S. ATTORNEY
     Santa Ana Division
5    411 West 4th Street, Suite 8000
     Santa Ana, CA  92701-4599
6    (714) 338-3500

7    For the Defendant:

8    IAN MICHAEL WALLACH
     LAW OFFICE OF IAN WALLACH, P.C.
9    5777 West Century Boulevard, Suite 750
     Los Angeles, CA  90045
10   (213) 375-0000

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

4

10:11   1              MR. WALLACH:  And the case title -- it has changed
        2     three times, but it is now --
        3              THE COURT:  Take the time you need.  We will just
        4     stand by.
10:11   5              MR. WALLACH:  I know it's in my moving papers.  It
        6     is now United States of America versus Guzman, et al., Case
        7     No. CR-19-117-ODW.
        8              My plan was to spend the next four or five months
        9     preparing for both trials.  It would be my obligation if we
10:11  10     move forward.
       11              Your Honor, I did want to make a record and let
       12     the Court know of a few things.  I am fully self-made.  I
       13     put myself through law school.  I put myself through
       14     undergraduate school.  I do not have a family that is able
10:12  15     to provide such resources for me.  I don't have a trust fund
       16     or anything.  I live in a town where my daughter lives also
       17     where the CJA rate is the same as it is nationally, which
       18     creates some hardship regularly.
       19              To have your own firm, you expect at times to have
10:12  20     mean years or to make some problematic errors, but that
       21     didn't happen this time.  The end result is because of a
       22     settlement I had this year, I was okay.  But come December,
       23     I'm out of money, flat out of money.  We're talking out of
       24     money to pay rent, to pay car payments, to pay health
10:12  25     insurance, and pay life insurance.

| | |
|---|---|
| 10:12 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:13 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:13 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 10:13 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 10:13 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 10:14 | 25 |

So I have gone back to CJA's counsel.  They have provided me a letter from the court explaining the situation, the delayed payment.  I took that to the management company where I live and was told that if I don't pay, I get a three-day notice.

I now have to find other work just to make ends meet.  That means going back to domestic violence cases and DUIs, which I don't mind, but to assume that they are readily available even to me, even though I have been doing felonies for so long, and I believe that my reputation is strong, and I have been before Your Honor on another case, and I think you have seen the compassion with which I work -- I'm on the Board of Directors for my third time of the National Association of Criminal Defense Lawyers.  It has three meetings a year.  Even now, I have to petition that organization to switch over to Zoom meetings.

The situation is saddening, infuriating, and embarrassing.  The fact that I have to make it public, I don't know of any other way.  I know the Eastern District case said there was not a showing of financial hardship.  I don't know if that's because he wasn't facing a genuine hardship, or he felt a tremendous amount of discomfort in sharing it, which I do but believe that I should not have to share this.  It is what it is, and this time I can say it's by no means any fault of my own.

10

**CERTIFICATE**

     I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  October 23, 2025

                        /s/    Sharon A. Seffens  10/23/25
                        _____
                        SHARON A. SEFFENS, U.S. COURT REPORTER

# EXHIBIT B

**From:**  ▮▮▮
**To:**    Margaret Farrand
**Subject:** Re: ▮▮▮
**Date:**   Wednesday, November 5, 2025 5:08:44 PM

I have two small children and my expenses have exceeded our income three months in a row because I dedicated time to my federal case. I'm facing special needs and possible private school with no ability to pay.

Get Outlook for iOS





**From:**
**To:**          Margaret Farrand
**Subject:**     RE:
**Date:**        Thursday, November 6, 2025 7:05:56 AM

Hi Margaret,

You asked for examples of how the funding issue is affecting us: I am the sole (female) breadwinner for my family of four, including two school-aged children. While I do not take on a large number of CJA cases, I do count on the income from those cases to support my family. The lack of funding has created stress and frustration and is untenable long term.

Thanks!

Attorney at Law

# EXHIBIT C

## DECLARATION OF SONJA BELAU

I, Sonja Belau, hereby state and declare as follows:

1.     I am the CJA Panel Administrator for the District of Alaska. I have held this role since March 2023. Before my current role, I served for approximately 14 years as a judicial assistant for the Honorable Morgan B. Christen, first at the Alaska Supreme Court and then at the U.S. Court of Appeals for the Ninth Circuit. Prior to my service with Judge Christen, I spent several years as a paralegal for multiple law firms and attorneys.

2.     As CJA Panel Administrator, my responsibilities include processing new cases and securing an attorney for each defendant. I help determine which defendants will be represented by the Federal Public Defender's Office and which will be assigned a CJA panel attorney.

3.     In general, neither a CJA panel attorney nor an attorney from the Federal Public Defender's Office is assigned to represent more than one defendant in a single case.

4.     Many members of the Alaska CJA panel reside out of state. Occasionally in multi-defendant cases, I am unable to locate a sufficient number of panel attorneys who can arrive in time for the initial appearance. In these limited circumstances, an attorney from the Federal Public Defender's Office will appear solely to assist the defendant as a "friend of the court."

5.     In most of these cases, the defendant has already been assigned a specific conflict-free CJA panel attorney—that attorney is simply unable to make it to court for the hearing. The assigned panel attorney will sometimes participate in the hearing telephonically, with the "friend of the court" attorney providing only needed in-person support.

6.     The FPD attorney appearing as "friend of the court" advises the defendant that the FPD has a conflict and that the defendant should not tell them anything about the case. The attorney assists the defendant in entering a plea of not guilty, if

1

applicable, and requests that all other matters be continued until conflict-free counsel is available.

7.    The attorney appearing as "friend of the court" does not assist the defendant in filling out the required financial affidavit. Instead, the court typically instructs that the financial affidavit should be completed with the assistance of conflict-free CJA panel counsel once counsel becomes available.

8.    The attorney appearing as "friend of the court" also does not take possession of the bail report or make any bail-related arguments. In short, the attorney does not engage in any substantive representation of the defendant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on *November 9*, 2025, at *Anchorage, Alaska*.

_____
SONJA BELAU

2